FILED

SEP 0 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

THE ARK INITIATIVE )
P.O. Box 1668 )
Pinedale, WY 82941 )
  )
DONALD DUERR )
P.O. Box 1668 / 133 S. Fremont )
Pinedale, WY 82941 )
  )
ALEX FORSYTHE )
411 Walnut #743 )
Green Cove Springs, FL 32043

PAUL SMITH
65 Aspen Village
Aspen, CO 81611

    Plaintiffs,

   v.

U.S. FOREST SERVICE )
1400 Independence Ave., SW )
Washington, D.C. 20250-0003 )
  )
DALE BOSWORTH, Chief of the U.S. Forest Service )
1400 Independence Ave., SW )
Washington, D.C. 20250-0003 )
  )
  )
    Defendants. )

CASE NUMBER    1:06CV01574

JUDGE: John D. Bates

DECK TYPE: Administrative Agency Review

DATE STAMP: 09/08/2006

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.    This action seeks declaratory and injunctive relief over the U.S. Forest Service's (hereinafter "Forest Service") violations of law in authorizing various logging, construction, ski trail development and other assorted ski area expansion activities at the Snowmass Ski Area in the White River National Forest near Aspen, Colorado.

2.     Specifically, the Forest Service is violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and its implementing regulations at 40 C.F.R. § 1500 et seq., in numerous respects, including by authorizing the expansion of the Snowmass Ski Area into currently undeveloped lynx habitat, roadless lands and a popular backcountry recreation area without preparing an environmental impact statement, analyzing a range of alternatives to the Forest Service's proposed action or taking the required "hard look" at the environmental impacts of the expansion activities on the numerous sensitive resources of the project area; and by failing to provide plaintiffs Duerr and The Ark Initiative numerous documents underlying and referenced in the agency's environmental analysis and decision.

3.     Injunctive relief is necessary to prevent the Forest Service from commencing vegetation management actions such as logging and tree felling, trail construction and other activities that will degrade irreplaceable roadless and backcountry recreational values, and lynx habitat pending completion of additional NEPA analysis required, as a result of plaintiff's administrative appeal, for a portion of the expansion project. Such activities, which may begin at any time, will violate NEPA because they are an irreversible and irretrievable commitment of resources, will have adverse environmental impacts, and limit the choice of reasonable alternatives in the required new NEPA analysis.

4.     Plaintiffs thus seek declaratory and injunctive relief, as prayed for below, in order to correct these violations of law while protecting the ecological values of the White River National Forest, its special roadless and popular backcountry recreation area, endangered and threatened species and their habitat, and other irreplaceable natural resources from the adverse effects of the Snowmass Ski Area expansion.

COMPLAINT -- 2

## JURISDICTION AND VENUE

5.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., NEPA, and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq. An actual, justiciable controversy exists between plaintiffs and defendants, and the requested relief is therefore proper under the Declaratory Relief Act 28 U.S.C. §§ 2201-2202, and 5 U.S.C. §§ 701-706.

6.    Venue lies in this judicial district pursuant to 5 U.S.C. § 552(a)(4)(B), and by virtue of 28 U.S.C. § 1391(e) because several of the violations occurred here and the defendants reside here.

7.    Plaintiffs have exhausted all administrative remedies required under FOIA, 5 U.S.C. § 552(a)(6)(C)(i), prior to bringing this action.

8.    The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

9.    Plaintiff DONALD DUERR is a resident of Pinedale, Wyoming. Mr. Duerr is an environmental consultant and a volunteer fireman for the Pinedale Fire Department. For nearly 20 years Mr. Duerr has participated in NEPA processes for countless National Forest management activities in the Rocky Mountain region, including on the White River National Forest in Colorado, and the Snowmass area in particular.

10.    Mr. Duerr has visited the White River National Forest and hiked in various roadless lands near Snowmass and Aspen Colorado. He uses and enjoys the public lands and natural resources of the White River National Forest, including Burnt Mountain and the lands in and around the Snowmass Ski Area, for many recreational, scientific, spiritual, educational,

aesthetic and other purposes. Mr. Duerr enjoys hiking, camping, bird watching, looking for wildlife, contemplation, photography and other activities in and around the public lands on the White River National Forest, including Burnt Mountain.

11.    In particular, Mr. Duerr recently visited the Snowmass area on August 18-20, 2006 and hiked on the currently undeveloped and unroaded lands on Burnt Mountain within the areas proposed for development by the project at issue here. Mr. Duerr plans to visit these areas again within the next year.

12.    Plaintiff, THE ARK INITIATIVE, is a 501(c)(3) nonprofit charitable public-interest organization dedicated to saving Earth's species. The Ark Initiative works to protect important wildlife habitats so these places can serve as natural "arks" where species may find refuge as the surrounding landscapes are "flooded" by human activities. The Ark Initiative uses three primary approaches to achieve its mission: (1) work to educate the public and government officials about the importance of protecting wild places and biological diversity, (2) use civil and lawful advocacy methods to encourage actions that better protect native species and their habitats, and (3) serve as a think-tank to develop novel strategies for conserving life on Earth.

13.    Mr. Duerr is the founder and currently the Director of The Ark Initiative, which currently has no paid staff and operates on an annual budget of less than $5000. As a concerned individual and as the director of The Ark Initiative, to achieve its mission Mr. Duerr participates in information gathering and dissemination, education and public outreach, commenting upon proposed agency actions, litigation and other activities relating to the Forest Service's management and administration of the National Forest Lands, including the White River National Forest, and the Snowmass Ski Area in particular.

14.    These interests are directly affected by the Forest Service's violations of federal laws and regulations in authorizing the Snowmass Ski Area expansion activities and by refusing

to provide Mr. Duerr reasonable and affordable access to the documents he requested directly relating to the project at issue here. The interests of Mr. Duerr and The Ark Initiative have been and will continue to be injured and harmed by the Forest Service's violations of law as complained of herein. These violations include the approval, authorization and implementation of Snowmass Ski Area expansion activities in violation of NEPA and the refusal to provide documents related to these expansion activities free of charge or at a reasonable rate, in violation of NEPA and FOIA. Unless the relief prayed for herein is granted, Mr. Duerr and The Ark Initiative will continue to suffer ongoing and irreparable harm and injury to their interests.

15.    Plaintiff ALEX FORSYTHE is a resident of Florida and is a professional chef. In his duties as a chef, Mr. Forsythe travels to different parts of the world, including Snowmass, to prepare meals for his clients. He has also regularly visited the Snowmass Ski Area for recreational purposes, not associated with his work. During these trips he repeatedly visits Burnt Mountain for his recreational pursuits, which include backcountry skiing, hiking, and wildlife watching, and for his emotional and spiritual wellbeing.

16.    Mr. Forsythe is an avid skier and regularly skis and hikes on Burnt Mountain whenever he is in Snowmass because of the untrammeled, backcountry experience it offers. Mr. Forsythe intends to continue visiting Snowmass regularly to, including within the next year, in part, ski and hike on Burnt Mountain.

17.    Because of his concern over the proposed Snowmass Ski Area expansion project and its potential impacts on Burnt Mountain, Mr. Forsythe circulated a petition urging the Forest Service to prohibit the construction of new ski runs on Burnt Mountain and also asking the Forest Service to convene a public hearing on the project. Mr. Forsythe signed the petition and spent considerable time talking with local residents in Snowmass and asking them to join the petition. Mr. Forsythe submitted the petition to the Forest Service during the NEPA comment

period. Nevertheless, the Forest Service declined to treat the petition as a substantive comment.

18.    Mr. Forsythe will be harmed by ski area expansion project because it will reduce his ability to use and enjoy the undeveloped lands and wildlife on Burnt Mountain. He is also harmed by the Forest Service's failure to treat the petition he circulated seriously and consider it as a substantive comment because it rendered meaningless his hard work and efforts to involve other members of the public.

19.    The interests of Mr. Forsythe have been and will continue to be injured and harmed by the Forest Service's violations of law as complained of herein. These violations include the authorization of Snowmass Ski Area expansion activities in violation of NEPA. Unless the relief prayed for herein is granted, Mr. Forsythe will continue to suffer on-going and irreparable harm and injury to his interests.

20.    Plaintiff PAUL SMITH has lived and worked in the Snowmass-Aspen area continuously for the last 25 years. He currently lives in Aspen, Colorado and manages a ski shop in Snowmass. An avid skier, Mr. Smith regularly skis all over the Aspen and Snowmass areas and frequently visits and skis on Burnt Mountain.

21.    One of the main reasons Mr. Smith has stayed in this area for so many years is because of the exceptional backcountry skiing opportunities on Burnt Mountain. His discovery of the backcountry skiing opportunities and natural roadless character of Burnt Mountain began in the early 1980's. He regularly skied on Burnt Mountain with other locals who introduced him to that area, and he discovered that Burnt Mountain is a unique place laden with wildlife and fantastic natural openings and glades for backcountry skiing. Mr. Smith has explored Burnt Mountain during every season of the year, and his experiences have included skiing, hiking, and wildlife watching.

22.    For Mr. Smith, Burnt Mountain is a unique backcountry skiing opportunity because it is undisturbed, undeveloped and roadless, providing the opportunity to enjoy undeveloped alpine mountain scenery while skiing in the natural backcountry.  Mr. Smith intends to continue backcountry skiing on Burnt Mountain so long as it remains in its current undisturbed, undeveloped condition.

23.    The interests of Mr. Smith have been and will continue to be injured and harmed by the Forest Service's violations of law as complained of herein.  These violations include the authorization of Snowmass Ski Area expansion activities in violation of NEPA.  Unless the relief prayed for herein is granted, Mr. Smith will suffer ongoing and irreparable harm and injury to his interests.

24.    Defendant UNITED STATES FOREST SERVICE is an agency or instrumentality of the United States, and is charged with managing the federal lands and resources of the White River National Forest, including those portions of the Snowmass Ski Area located therein, in accordance and compliance with federal laws and regulations.

25.    Defendant DALE BOSWORTH is sued solely in his official capacity as the Chief of the U.S. Forest Service.  Mr. Bosworth is the agency official who is charged under FOIA with reviewing and issuing a timely final determination on plaintiff Donald Duerr's July 4, 2005 FOIA appeal.

## RELEVANT STATUTORY AND REGULATORY PROVISIONS

26.    NEPA is our basic national charter for protection of the environment.  42 U.S.C. § 4321 et seq; 40 C.F.R. §1500.1(a).  NEPA and its implementing regulations require the Forest Service to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.  Initiating NEPA "at the earliest possible

COMPLAINT -- 7

time," ensures that "environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken." 40 C.F.R. § 1500.1(b) (emphasis added).

27.    NEPA's regulations require agencies to provide public notice of the availability of environmental documents so as to inform those persons who may be interested or affected, and to hold public hearings or meetings when there is substantial environmental controversy concerning the proposed action or substantial interest in holding a hearing.  40 C.F.R. §§ 1506.6(b), (c).

28.    NEPA and its implementing regulations require federal agencies to prepare an environmental impact statement ("EIS") to evaluate the environmental impacts of any proposed major federal action that may significantly affect the environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9(a)(1).  An agency may prepare an environmental assessment ("EA"), however, to determine whether a project may have significant environmental impacts and, therefore, requires an EIS. 40 C.F.R. § 1508.9.  If the EA concludes that the project may have a significant impact on the environment, then an EIS must be prepared. Id.  If not, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a "Finding of No Significant Impact." 40 C.F.R. § 1508.13.

29.    NEPA obligates all federal agencies to undertake a thorough description and analysis of the environmental consequences of proposed federal actions, such as authorizing ski area expansion activities. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501 et seq.. To comply with this "hard look" requirement, the Forest Service must include an analysis of the direct, indirect, and cumulative effects of the proposed action.  40 C.F.R. §§ 1508.7, 1508.8, 1508.9.

30.    In addition, NEPA's regulations obligate agencies to examine so-called "connected" actions. Actions are "connected" if they: (i) automatically trigger other actions which may require environmental impact statements, (ii) cannot or will not proceed unless other

actions are taken previously or simultaneously, or (iii) are interdependent parts of a larger action and dependent on the larger action for their justification. 40 C.F.R. § 1508.25(a)(1).

31.    NEPA also requires federal agencies, including the Forest Service, to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 42 U.S.C. § 4332; 40 CFR § 1502.14(a); *see also* 40 C.F.R. §1501.2.

32.    To eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review, NEPA encourages "tiering," which refers to "the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

33.    When agencies incorporate material by reference, such as by tiering or otherwise, the incorporated material must be made "reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R § 1502.21.

34.    Agencies must make "environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. § 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council." 40 C.F.R. § 1506.6(f).

## FACTUAL BACKGROUND

### The Snowmass Ski Area and Burnt Mountain

35.    The Snowmass Ski Area is located in Pitkin County, Colorado near the towns of Snowmass Village and Aspen. This ski area currently boasts over 3,100 acres (about 5 square miles) of skiable terrain, more than 20 ski lifts, and 88 improved downhill ski trails totaling over 137 miles.

36.    Most of the land occupied by the Snowmass Ski Area (approximately 80 percent of the acreage within the ski area boundary) occurs on the White River National Forest, which is administered by the Forest Service. The Forest Service issued the Aspen Skiing Company a long-term special use permit to operate the Snowmass Ski Area on National Forest System lands.

37.    The Forest Service's management of the White River National Forest, including those lands occupied by the Snowmass Ski Area, is governed by the Forest's Land and Resource Management Plan, which was revised in 2002 (hereinafter "2002 Forest Plan"). The 2002 Forest Plan sets the management, protection and use standards and guidelines the Forest Service must follow when authorizing projects on the Forest, such as ski area expansions.

38.    Between Snowmass and another ski area also owned and operated by the Aspen Skiing Co., the Buttermilk/Tie Hack Ski Area, is a tract of National Forest land that does not have roads, ski lifts or developed ski runs. This tract of undeveloped and unroaded land is located on Burnt Mountain and contains mature forest and significant aspen stands and wetlands. The southern border of the undeveloped and unroaded tract of National Forest land runs along the summit of Burnt Mountain and adjoins the Maroon Bells - Snowmass Wilderness Area.

39.    A portion of the roadless lands on Burnt Mountain was inventoried and designated by the Forest Service in the 2002 Forest Plan as the Burnt Mountain Inventoried Roadless Area.

COMPLAINT -- 10

40.    The roadless and undeveloped Burnt Mountain is a favorite backcountry ski area for recreationists, including plaintiffs Paul Smith and Alex Forsythe, who prefer the ungroomed and unpopulated terrain over the developed, groomed and more heavily used ski runs typical of commercial ski areas such as the Snowmass Ski Area.

41.    There is a long history – beginning in the early 1980's - of controversy and public opposition to the Aspen Skiing Company's repeated attempts to develop ski lifts and groomed ski trails on Burnt Mountain.

42.    In addition to providing exceptional backcountry skiing and other recreation opportunities, Burnt Mountain provides habitat for a variety of wildlife and plant species, including sensitive and threatened species. For example, all known calving habitat for the Maroon Bells - Snowmass Wilderness elk herd is within the expansion area on Burnt Mountain.

43.    Burnt Mountain also provides habitat for a number of sensitive species including, but not limited to: American marten, pygmy shrew, olive-sided flycatcher, boreal toad, northern goshawk, boreal owl, northern harrier, wolverine, peregrine falcon, white-tailed ptarmigan, flammulated owl, three-toed woodpecker, purple martin, northern leopard frog, mountain sucker and Colorado river cutthroat trout.

44.    Portions of Snowmass Ski Area and Burnt Mountain are identified by the U.S. Fish and Wildlife Service ("FWS") – the federal agency charged with administering the Endangered Species Act ("ESA") - as lynx habitat, including winter foraging habitat. The FWS listed lynx as a threatened species under the ESA in 2000. On information and belief, a lynx was spotted on Burnt Mountain in April 2006.

<u>The 1994 Snowmass Ski Area Master Plan</u>

45.    Prior to 1994, the Aspen Skiing Co. submitted a Snowmass Ski Area Master Development Plan ("Master Plan") to the Forest Service that detailed its plans for the future

development and expansion of the Snowmass ski area.

46.    In 1994, the Forest Service issued a Final Environmental Impact Statement ("1994 EIS"), which studied certain impacts of the actions proposed in the Master Plan. The Forest Service then issued a Record of Decision ("1994 ROD") approving portions, and also disapproving portions of the proposed Master Plan. The 1994 ROD also deferred some of the proposed actions for further study, and conditionally approved others. According to the 1994 ROD, the Forest Service expected the "useful life" of the Master Plan to be seven to ten years.

47.    The 1994 EIS did not analyze impacts of the Master Plan on roadless lands, such as those on Burnt Mountain; nor did it analyze the Master Plan's likely impacts on lynx, which were not listed as threatened at that time.

### The 2002 Forest Plan and Lynx

48.    As stated above, in 2002, the White River National Forest issued a revised Forest Plan to govern management of the entire Forest, including those portions of the Snowmass Ski Area on Forest Service land.

49.    Due to the presence of the threatened lynx on the White River National Forest, the Forest Service and FWS conducted ESA Section 7 consultation over the 2002 Forest Plan. Pursuant to this consultation, the FWS determined that implementation of the 2002 Forest Plan – specifically including those portions relating to ski area expansions – was "likely to adversely affect" lynx.

50.    As a result of this "likely to adversely affect" determination, and to minimize the impacts of the 2002 Forest Plan on lynx, the FWS required the Forest Service to incorporate a number of "reasonable and prudent measures," and the "terms and conditions" necessary to implement them, into the 2002 Forest Plan. The FWS also made several conservation recommendations.

COMPLAINT -- 12

51.    These reasonable and prudent measures are:  (1) Measures shall be taken at the individual project level to eliminate or minimize adverse affects to…lynx and their habitat; (2) Measures shall be taken across the Forest to improve habitat conditions for lynx prey, primarily snowshoe hare, and red squirrel...; and (3) Determine baseline snow compaction conditions, to include permitted routes, snowmobile play areas, and frequent use areas for all winter activities.

52.    For example, the FWS imposed the mandatory "term and condition" that if a project (such as a ski area expansion) results in the permanent destruction of lynx winter foraging habitat, such habitat must be replaced by manipulating certain "other" lynx habitat through vegetation management practices such as logging or fire. The term and condition specifically states that the focus of these management practices "should be within mature, mesic lodgepole pine stands that currently provide lower quality winter foraging habitat and move it towards higher quality winter forage habitat conditions."

53.    The FWS also made several ski area-specific conservation recommendations to further minimize or avoid adverse effects to lynx.  These include, but are not limited to: "The White River National Forest shall work with the ski area permittees to ensure that NEPA analyses include and address information valuable to the [FWS]. This includes:  Consideration of "batching" several projects into one environmental analysis.  Completing a thorough cumulative effects analysis that examines 5 or more years of potential projects on the ski areas. A list of reasonable foreseeable developments over the next 5 to 10 years that the area may be considering – part of cumulative effects. Adequately addressing potential impacts of those activities on threatened and endangered species."

### The 2003 Master Plan Amendment

54.    The 1994 Master Plan was significantly amended and updated in 2003 by a Master Plan Amendment (hereinafter "2003 Master Plan Amendment"), which the Aspen Skiing

Co. submitted to the Forest Service to detail the next phase of development of the Snowmass Ski

Area. The 2003 Master Plan Amendment provides for numerous construction and expansion

activities at the Snowmass Ski Area including, but not limited to, the construction, replacement

and/or upgrading of seven ski lifts; construction and development of new ski runs and ski lifts on

Burnt Mountain; construction of new restaurants and dining facilities; construction of new

downhill ski trails and a new vehicle maintenance facility; construction of new water storage

ponds on the mountain to facilitate increased snow making operations; and grading (i.e. leveling

and lowering by approximately 16 feet) the top of one of the mountain summits to accommodate

a new lift terminal. The Master Plan Amendment also provides for construction of a new "base

village" complex to provide "skier services, mountain operations facilities, retail opportunities, a

mass transit portal and lodging facilities."

     55.    On information and belief, development and implementation of portions of the

2003 Master Plan Amendment are currently underway, including construction of the base

village, new ski runs and lift facilities, including the leveling of one mountain summit, Sam's

Knob, to install a new lift and terminal – this is discussed in more detail below.

     56.    Neither the 1994 Master Plan, nor the 2002 Forest Plan, address the impacts of the

activities provided for in the 2003 Master Plan Amendment and the Forest Service has not

prepared a supplemental EIS to do so, despite requests by the plaintiffs. Thus, the 2003 Master

Plan Amendment, as a whole, never went through the NEPA environmental analysis or public

participation process.

    <ins>The 2006 Snowmass Ski Area Master Plan Amendment Ski Area Improvements Project</ins>

     57.    Instead of analyzing the entire 2003 Master Plan Amendment as a whole, in 2003

the Forest Service initiated a "scoping" process to solicit comments on just three of the 2003

Master Plan Amendment's proposed activities: 1) replacement and realignment of the Big Burn

ski lift; 2) re-grade and lower the summit of Sam's Knob and install a new high-speed Express Lift to the top of Sam's Knob; and 3) construction of three downhill ski runs and an egress traverse trail on Burnt Mountain. This is known as the "Snowmass Ski Area Master Plan Amendment Ski Area Improvements" project.

58.     According to the Forest Service, the only form of notice provided to the public was publication in the Aspen Times Weekly during the "off season" period of May 24 through June 23.

59.     On December 30, 2004 the Forest Service issued a Draft EA for the Snowmass Ski Area Master Plan Amendment Ski Area Improvements project for public review.  Plaintiffs are informed and believe that no conservation groups, local businesses or local landowners were provided a copy of the 2004 Draft EA unless they specifically requested it. A news release was published in local newspapers.

60.     A second Draft EA was released to the public on July 20, 2005.  The 2005 Draft EA covered only the three proposed activities listed above and did not analyze any of the other actions in the 2003 Master Plan Amendment.

61.     Plaintiffs submitted extensive comments on the 2005 Draft EA.  In particular, the plaintiffs informed the Forest Service that the lands on Burnt Mountain where the new ski runs were to be constructed are undeveloped and roadless, provide valued backcountry skiing and other recreational opportunities, and also provide habitat for lynx and other vulnerable species. Accordingly, the plaintiffs requested that the agency prepare an EIS and evaluate alternatives to the proposed development of Burnt Mountain. Further, plaintiffs requested that the Forest Service analyze the direct, indirect and cumulative impacts of all of the activities proposed in the 2003 Master Plan Amendment.

62.    In February 2006, the Forest Service issued a Final EA ("2006 Final EA") for the Snowmass Ski Area Master Plan Amendment Ski Area Improvements project.

63.    Both the Draft and Final EAs evaluated only three alternatives: (A) No Action -- approve none of the proposed actions; (B) Proposed Action; and (C) Modified Action Alternative - the proposed actions with minor modifications, including relocation of a segment of one of the proposed developed ski runs on Burnt Mountain to avoid a wetland.

64.    Despite plaintiffs' specific request and comments on the 2005 Draft EA, the 2006 Final EA did not evaluate an action alternative that would avoid developing new groomed ski trails on Burnt Mountain or otherwise eliminate or minimize impacts to lynx habitat, roadless values, backcountry recreation opportunities, and other resource values.

65.    At the same time the Forest Service issued the 2006 Final EA, it also issued a Decision Notice ("2006 Decision") and "Finding of No Significant Impact" ("2006 FONSI"). The 2006 Decision selected Alternative C with some modifications and authorized two of the proposed activities: 1) replacement and realignment of the Big Burn ski lift and 2) construction of three downhill ski runs and an improved egress traverse trail on Burnt Mountain.

66.    The 2006 Decision asserts that the Sam's Knob summit regrade and lift replacement activity – one of the three activities addressed in the 2005 Draft EA -- was authorized previously "by means of the 2005 Snowmass Summer Construction Plan." Yet, no formal appealable decision was ever issued by the Forest Service for this action, and the plaintiffs were not provided with a copy of or given the opportunity to review and comment on the Snowmass Summer Construction Plan. In fact, the Forest Supervisor allowed the Aspen Skiing Co. to begin construction of the Sam's Knob summit re-grade and lift replacement project prior to issuance of the 2006 Decision.

67.    Because the egress and ski trails to be developed on Burnt Mountain will destroy lynx habitat, and purportedly to comply with the "terms and conditions" incorporated into the 2002 Forest Plan, as discussed above, the 2006 Decision sets forth measures the agency claims will mitigate this habitat loss. One such mitigation measure is to provide additional lynx winter foraging habitat by conducting vegetation management such as logging, bulldozing and/or otherwise felling trees, within another area of Burnt Mountain.

68.    Contrary to the specific language of the applicable "term and condition," however, the vegetation management is not within mesic lodgepole pine stands, but within a completely different forest type. On information and belief, the forest type proposed for the lynx mitigation vegetation management already provides adequate winter forage habitat conditions.

69.    While the 2006 Decision acknowledged that the authorized egress ski trail on Burnt Mountain (which will bring skiers from Burnt Mountain back to the main ski lift area) would cut across the Burnt Mountain Inventoried Roadless Area, the 2006 Final EA did not analyze the impacts the ski trail construction, logging and associated actions, would have on the Inventoried Roadless lands. Nor did the 2006 Final EA analyze the impacts to the overall roadless character or backcountry recreational opportunities on Burnt Mountain.

70.    In August 2005, the Forest Service received petitions signed by more than 40 citizens, asking the agency to prohibit the construction of ski runs on Burnt Mountain and to convene a public hearing on the proposed actions. The Forest Service did not grant the petition and did not convene a public hearing as requested, asserting that the petition did not constitute a substantive comment on the 2005 Draft EA. Those petitioners who did not otherwise provide comments on the 2005 Draft EA did not receive a copy or notification of the 2006 Final EA, nor a copy or notice of the 2006 Decision authorizing the construction of developed ski trails on Burnt Mountain.

COMPLAINT -- 17

71.    On April 10, 2006, the plaintiffs and other parties filed an administrative appeal of the 2006 Final EA, FONSI and Decision.

72.    On or about May 22, 2006, the Deputy Regional Forester ruled on the plaintiffs' administrative appeal. The appeal ruling denied all of plaintiffs' appeal claims with the exception of certain claims related to the failure of the 2006 EA to analyze and disclose the impacts of the egress trail on the Burnt Mountain Inventoried Roadless Area.

73.    The appeal ruling granted plaintiffs' requested relief related to the Burnt Mountain Inventoried Roadless Area that no work occur within the Burnt Mountain IRA "until sufficient analysis of the impacts to the IRA can be disclosed." Further, the ruling stated that "actions associated with the Burnt Mountain Ski Traverse and Ski Trail Development may not be implemented. If the Forest Supervisor decides to proceed with that portion of the Snowmass...proposal, within the Burnt Mountain Inventoried Roadless Area ... a new decision will be required. The new decision will be appealable under the provisions of 36 CFR § 215."

74.    On information and belief, the Forest Service has interpreted this appeal ruling to mean that the agency need only halt development of the egress trail within the Burnt Mountain Inventoried Roadless Area but not the construction (including logging) of the other ski trails or the lynx habitat mitigation actions.

75.    Yet, the Burnt Mountain egress trail, ski runs and the lynx mitigation measures are inextricably linked: The egress trail is necessary so that skiers can return from the new Burnt Mountain ski trails to the main ski lift area, and the lynx mitigation measures are supposedly to mitigate for the impacts of the egress and ski trails on lynx habitat.

76.    Thus, because all of these actions are a single, integrated action with cumulative, interrelated environmental impacts requiring analysis in a single EA, the reversal of a portion of the NEPA analysis and decision renders the 2006 Final EA inherently flawed - the existing

piecemeal analysis does not suffice under NEPA.

77.    Further, the development of the ski runs and/or the lynx mitigation actions will be an irreversible and irretrievable commitment of resources and will limit the choice of reasonable alternatives in the required analysis concerning the egress trail's necessity and location, rendering the new analysis a foregone conclusion in violation of NEPA.

### Public Record Requests

78.    The 2005 Draft EA and 2006 Final EA incorporated a substantial amount of material by reference.  While some of the references were attached to these documents as appendices, numerous others were not.

79.    To better understand the 2005 Draft EA, the project's potential impacts, and the possibility of other reasonable alternatives to the Forest Service's proposed action, Mr. Duerr, on behalf of himself and The Ark Initiative, requested from the Forest Service some of the referenced and other underlying documents and data. These requests were submitted between April 15, 2005 and May 2, 2005 pursuant to the public involvement provision of CEQ's NEPA regulations, 40 CFR § 1506.6(f).  Pursuant to this provision, Mr. Duerr also requested that the Forest Service make the materials available to him without charge.

80.    While the Forest Service provided a select few of the documents Mr. Duerr requested, in a letter dated May 19, 2005, the agency informed Mr. Duerr that he was not entitled to a fee waiver, and requested payment of close to three thousand dollars before the information requests would be processed.

81.    Mr. Duerr appealed this decision to the Chief of the Forest Service in an appeal dated July 4, 2005.

82.    In a letter dated August 10, 2005, Rita M. Morgan — a FOIA and Privacy Act Officer in the Forest Service's Headquarters — sent Mr. Duerr a "status report and request for

additional information" asserting that 40 C.F.R. § 1506.6(f) requires only that the Forest Service provide to the public free of charge "*crucial* public records such as notices, hearings, and environmental impact statements, public comments received and views of other appropriate Federal, state, and local agencies." She further asserted that, because a majority of the records Mr. Duerr requested are not considered "crucial public records" the agency was "required to collect fees for these non-crucial records."

83.    In addition, Ms. Morgan asserted that Mr. Duerr had not furnished sufficient information for the agency to determine whether a fee waiver should be granted and instructing Mr. Duerr to provide the Forest Service with extensive additional information to show how he qualifies for a fee waiver including the articles of incorporation and bylaws of The Ark Initiative, as well as copies of samples of his past work such as newsletters, memoranda from public meetings, educational presentations, television and radio interviews, newspaper articles, testimony before Congress, brochures, books and reports.

84.    Mr. Duerr responded, through his attorney, in a detailed letter dated September 12, 2005, that 40 C.F.R. § 1506.6(f) was not limited to just "crucial public records" but required the agency to make all documentation underlying a NEPA statement available to the public at no cost to the extent practicable or at no more than the cost of making copies – as the regulations explicitly states.

85.    To date, the Forest Service has not furnished Mr. Duerr with copies of the records he requested. Thus, Mr. Duerr was required to comment on the Draft EA as well as appeal the 2006 Final EA, FONSI and Decision (which incorporated and referenced the same underlying documents and information) without the underlying documents and information referenced therein, thus significantly prejudicing his ability to provide adequate and comprehensive comments and appeal.

86.    Nor has the Forest Service responded to the September 12, 2005 letter, or issued a

final determination on the appeal.

## FIRST CLAIM FOR RELIEF:

### 2006 SNOWMASS SKI AREA MASTER PLAN AMENDMENT
### SKI AREA IMPROVEMENTS PROJECT
### VIOLATIONS OF NEPA AND THE APA

87.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

88.    In issuing the 2006 Final EA, FONSI and 2006 Decision, the Forest Service

violated NEPA and its implementing regulations in multiple respects, which include, but are not

limited to:

a.    Undertaking irreversible and irretrievable commitments of resources that

limit the choice of reasonable alternatives and impact Burnt Mountain

prior to commencing or completing the new NEPA analysis required by

the administrative appeal decision;

b.    Segmenting the analysis of the Burnt Mountain ski runs and lynx

mitigation from analysis of the egress trail;

c.    Failing to prepare an Environmental Impact Statement;

d.    Failing to analyze an adequate range of alternatives, including action

alternatives that would eliminate or minimize destruction of lynx habitat,

roadless values and backcountry recreation opportunities on Burnt

Mountain; and/or conduct the lynx mitigation treatments in mesic

lodgepole habitat;

e.    Failing to consider the direct, indirect and cumulative impacts of the

Snowmass Ski Area Master Plan Amendment Ski Area Improvements

project on Burnt Mountain and its roadless lands, including the Inventoried

Roadless Area; threatened lynx and its habitat; other wildlife and bird

species; native vegetation; and the Burnt Mountain backcountry

recreational uses and opportunities;

f.    Failing to consider the cumulative impacts of the Snowmass Ski Area

Master Plan Amendment Ski Area Improvements project with the

numerous additional developments and projects detailed in the full 2003

Master Plan Amendment, some of which are already being implemented

on the ground;

g.    Failing to consider the full 2003 Master Plan Amendment, and the actions

detailed therein, some of which already being implemented on the

ground, as connected actions to the Snowmass Ski Area Master Plan

Amendment Ski Area Improvements project;

h.    Tiering the 2005 Draft and 2006 Final EAs and the 2006 Decision to the

outdated 1994 Master Plan and 1994 Master Plan EIS; and to the 2003

Master Plan Amendment, which did not undergo NEPA analysis.

i.    Failing to provide adequate public notice of the draft and final NEPA

documentation for the Snowmass Ski Area Master Plan Amendment Ski

Area Improvements project;

j.    Failing to conduct a public hearing on the Snowmass Ski Area Master Plan

Amendment Ski Area Improvements despite the substantial controversy

concerning the proposed action and substantial interest in, and a specific

request to, hold a hearing.

89.    The 2006 Final EA, FONSI and 2006 Decision represent final agency action that

is judicially reviewable under the APA, 5 U.S.C. § 706(2), and must be reversed and set aside as arbitrary, capricious, an abuse of discretion, contrary to law, and/or without observance of procedure required by law.

## SECOND CLAIM FOR RELIEF

### 2003 SNOWMASS SKI AREA MASTER PLAN AMENDMENT VIOLATIONS OF NEPA AND THE APA

90.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

91.    NEPA's implementing regulations provide, in part, that federal actions include "[a]doption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. § 1508.18(b)(2).

92.    In adopting the 2003 Master Plan Amendment, the Forest Service violated NEPA and its implementing regulations in multiple respects that include, but are not limited to:

      a.    Failing to prepare and EA or EIS on the full 2003 Master Plan Amendment prior to adopting it as the overarching plan for the future expansion of the Snowmass Ski Area;

      b.    Undertaking irreversible and irretrievable commitments of resources that limit the choice of reasonable alternatives and cause environmental impacts prior to commencing or completing NEPA analysis on the full 2003 Master Plan Amendment.

93.    The Forest Service's adoption of the 2003 Master Plan Amendment represents final agency action that is judicially reviewable under the APA, 5 U.S.C. § 706(2), and must be reversed and set aside as arbitrary, capricious, an abuse of discretion, contrary to law, and/or without observance of procedure required by law.

94.    In the alternative, the Forest Service's failure to prepare an EA or EIS on the 2003

Master Plan Amendment represents agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

### THIRD CLAIM FOR RELIEF

### PUBLIC RECORDS REQUEST
### VIOLATIONS OF NEPA, FOIA AND THE APA

95.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

96.    As hereinbefore alleged, CEQ's NEPA regulations mandate that no material may be incorporated by reference into a NEPA document, unless the incorporated material is made reasonably available for inspection by potentially interested persons within the time allowed for comment. 40 C.F.R § 1502.21.

97.    In addition, the NEPA regulations further require agencies to make "environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. § 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council." 40 C.F.R. § 1506.6(f).

98.    The Forest Service violated these provisions of NEPA and its implementing regulations, as well as FOIA, 5 U.S.C. § 552 et seq., and its implementing regulations in numerous respects including, but not limited to:

      a.    Failing to provide the documents incorporated in and underlying the 2005 Draft EA, 2006 Final EA, FONSI and 2006 Decision, as specifically requested by plaintiffs Mr. Duerr and The Ark Initiative within the time frame allowed for Mr. Duerr to prepare his comments and appeal;

b.     Failing to make the material incorporated in the 2005 Draft EA, 2006 Final

EA, FONSI and 2006 Decision reasonably available for inspection by potentially

interested persons - here Mr. Duerr - within the time allowed for comment on

these NEPA documents.

c.     Charging Mr. Duerr and The Ark Initiative substantial "search" fees for the

requested documents;

d.     Refusing to provide the requested documents without charge to the extent

practicable or at a fee, which is not more than the actual costs of reproducing

copies required to be sent to other Federal agencies;

e.     Failing to issue a final determination on Mr. Duerr and The Ark Initiative's

July 4, 2005 administrative appeal; and

f.     Refusing to grant Mr. Duerr and The Ark Initiative a fee waiver to the

requested documents;

99.     The Forest Service's failure to adhere to NEPA's and FOIA's requirements for the

release of information and response to Mr. Duerr's NEPA and FOIA appeal, is arbitrary, capricious,

an abuse of discretion, not in accordance with law and/or constitutes agency action unlawfully

withheld or unreasonably delayed under the APA, which has caused or threatens prejudice and

injury to plaintiffs' rights and interests.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### REQUEST FOR RELIEF

By way of relief, Plaintiffs request that this Court:

A.     Order, declare and adjudge that Defendants violated NEPA and the APA and/or

their implementing regulations in their management of and authorization of the Snowmass Ski

Area Master Plan Amendment Ski Area Improvements;

      B.      Reverse and remand the 2006 Final EA, FONSI and 2006 Decision pursuant to APA Section 706;

      C.      Issue declaratory, injunctive, and/or mandamus relief, requiring Defendants to issue an Environmental Impact Statement for the Snowmass Ski Area Master Plan Amendment Ski Area Improvements;

      D.      Order, declare and adjudge that Defendants are violating NEPA and the APA and/or their implementing regulations in their acceptance and implementation of the full 2003 Master Plan Amendment;

      E.      Issue declaratory, injunctive, and/or mandamus relief requiring Defendants to halt implementation of the 2003 Master Plan Amendment unless and until Defendants complete the NEPA environmental analysis and public participation process for the full 2003 Master Plan Amendment;

      F.      Order, declare and adjudge Defendants violated NEPA and/or FOIA by failing to provide the underlying and referenced documents in the 2005 Draft EA, 2006 Final EA, FONSI and 2006 Decision as requested in Mr. Duerr and The Ark Initiative's requests submitted between April 12, 2005 and May 2, 2005;

      G.      Declare that Defendants violated FOIA by failing to timely respond to Mr. Duerr and The Ark Initiative's appeal dated of July 4, 2005;

      H.      Order by injunction that Defendants immediately provide Mr. Duerr with the records he requested free of charge;

      I.      Award Plaintiffs their reasonable costs, attorney's fees and litigation expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., FOIA, 5 U.S.C. § 522 et seq., and all other applicable authorities; and

      Grant such further and other relief as the Court deems just and proper.

Dated this 8th day of September, 2006          Respectfully submitted,

JAMES B. DOUGHERTY (D.C. Bar # 939583)
709 Third St. SW
Washington DC  20024
(202) 488-1140
(202) 484-1789 *[FAX]*
jimdougherty@aol.com

JUDITH M. BRAWER (ID Bar # 6582)
1502 N. 7th Street
Boise, Idaho  83702
(208) 342-7024
jbrawer@jbrawerlaw.com

SCOTT P. SCHLESINGER (FL Bar # 444952)
1212 Southeast Third Avenue
Fort Lauderdale, FL  33316
(954)-467-8800
(954)-523-4803 *[FAX]*
scott@schlesingerlaw.com

COMPLAINT -- 27